UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

The Travelers Indemnity          :
Company and                      :
Travelers Property Casualty      :
Company of America,              :
          Plaintiffs,            :
                                 :    No. 1:08-CV-92
          v.                     :
                                 :
Acadia Insurance Company,        :
          Defendant.             :


**<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>**
(Papers 20 & 21)


In January, 2007 the City of Rutland, Vermont

("Rutland") filed suit in Rutland County Superior Court

against T. Buck Construction, Inc. ("T. Buck") to recover

damages caused by an allegedly defective roof at Rutland's

Water Filtration Plant, for which T. Buck was the general

contractor. Two of T. Buck's liability insurance carriers,

The Travelers Indemnity Company ("Travelers") and the

Maryland Casualty Company ("Zurich"), agreed to provide

coverage for T. Buck's defense, while a third carrier,

Acadia Insurance Company ("Acadia"), refused coverage. On

April 18, 2008, Travelers filed the instant action against

Acadia, seeking equitable relief including a declaratory

judgment that Acadia is obligated to contribute to T. Buck's

defense in the City of Rutland action. 28 U.S.C. § 2201(a).

On October 3, 2008, the parties filed cross-motions for summary judgment. (Papers 20 & 21). For the reasons stated below, I recommend that Acadia's motion be DENIED, and Travelers' motion be GRANTED.

## Background

The parties agree to the following factual background. In December of 1993, Rutland entered a contract with T. Buck to serve as general contractor for the construction of a Water Filtration Plant ("the Plant"). (Paper 1-3 ¶ 13). Construction of the Plant required installation of a roof which consisted, in part, of pre-cast, pre-stressed, concrete hollow core roof panels and a rubber membrane waterproofing system. T. Buck hired a subcontractor to manufacture and install the entire roof of the Plant, including the concrete panels and rubber membrane. Id. ¶¶ 18-23.

Construction of the Plant began in early 1994 and was completed in September, 1995. Id. ¶ 24. In September, 2004, the City of Rutland discovered that the Plant's roof was defective and, in January, 2007, Rutland instituted the underlying state action against T. Buck seeking recovery of damages caused by the defective roof. Id. ¶ 25; (Paper 21-5 ¶ 5). Specifically, the complaint seeks damages for, among

other things, the cost of replacing the defective roof, installing various remedial measures which allowed Plant operations to continue while the roof underwent repairs, and increased labor costs caused by the loss of use of the Plant at full capacity. (Paper 1-3 ¶ 36).

The underlying complaint alleges that both the concrete panels and rubber membrane waterproofing system were defective. According to the complaint, the damage to the concrete panels was caused by, among other things, failure to properly fabricate the concrete used for the panels, resulting in "delayed ettringite formation" ("DEF") and "alkali-silica reaction" ("ASR").[1] These problems were exacerbated by the failure of the rubber roof membrane, which allowed water and excessive moisture to penetrate the roof planks. Id. ¶¶ 27-30. The concrete panels deteriorated over time, and the damage was not discoverable until 2004 when large chunks of concrete fell from the roof into the water filters below. Id. ¶ 32.

From April 1994 through 2006 T. Buck carried commercial general liability ("CGL") insurance policies with

---

[1] In its Motion for Summary Judgment, Travelers provides a more detailed explanation of ASR and DEF and how both problems are symptomatic of gradual and progressive concrete damage. These averments are not contradicted by Acadia. (Paper 21-2 at 20-21).

three different providers.  Zurich issued policies effective from April 1, 1994 to April 1, 1999; Acadia issued policies effective from April 1, 1999 to April 1, 2002; and Travelers issued policies effective April 1, 2002 to April 1, 2006. (Paper 21-9 ¶¶ 1-3).  T. Buck properly tendered its defense in the City of Rutland action to all three insurers.  Id. ¶ 6.  Both Zurich and Travelers agreed to participate in the defense, while Acadia refused.  Id. ¶¶ 7-8.

Before the Court are Travelers' and Acadia's cross-motions for summary judgment under Federal Rule 56. Fed. R. Civ. P. 56; (Papers 20 & 21).

## **Standard of Review**

Summary judgment should be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also City of Burlington v. Hartford Steam Boiler Inspection and Insurance Co., 190 F. Supp. 2d 663, 669 (D. Vt. 2002).  To decide such a motion, the trial court must resolve all ambiguities and draw all inferences in favor of the non-moving party and decide whether a rational juror could decide in favor of that party.  Id.; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, the non-moving party must offer more

than "mere speculation and conjecture...to preclude the granting" of summary judgment. <u>Harlen Associates v. Village of Mineola</u>, 273 F.3d 494, 499 (2d Cir. 2001).

## **Discussion**

The parties agree that Maine law governs the interpretation of Acadia's insurance policy and whether it creates a duty for Acadia to defend T. Buck. (Paper 1 ¶ 9; Paper 11 ¶ 9). Under Maine law, the meaning of language within an insurance policy and whether the insurer owes a duty to defend are purely questions of law. <u>Jipson v. Liberty Mutual Fire Insurance, Co.</u>, 942 A.2d 1213 (Me. 2008). A "contract of insurance, like any other contract, is to be construed in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument." <u>Peerless Insurance Co. v. Brennon</u>, 564 A.2d 383, 386 (Me. 1989). However, insurance policies must be interpreted strongly against the insurer, and any ambiguity must be resolved to support a duty to defend. <u>Bucci v. Essex Ins. Co.</u>, 393 F.3d 285, 290 (1st Cir. 2005); <u>Massachusetts Bay Insurance Co. v. Ferraiolo Construction Co.</u>, 584 A.2d 608, 609 (Me. 1990). Nevertheless, the "court must interpret unambiguous language in a contract according to its plain and commonly accepted meaning." <u>Peerless</u>, 564

A.2d at 384 (quoting <u>Brackett v. Middlesex Insurance Co.</u>, 486 A.2d 1188, 1190 (Me. 1985)).

An insurer's obligation to defend is determined by a "comparison test," which simply requires the court to compare "the allegations in the underlying complaint with the provisions of the insurance policy." <u>Foundation for Blood Research v. St. Paul Marine & Fire Insurance Co.</u>, 730 A.2d 175, 177 (Me. 1999) (citing <u>Gibson v. Farm Family Mutual Insurance, Co.</u>, 673 A.2d 1350, 1352 (Me. 1996)). In order for the duty of defense to arise, though, "the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." <u>Peerless</u>, 564 A.2d at 384. Finally, once coverage is established, policy exclusions precluding coverage are disfavored and are strongly construed against the insurer. <u>Hall v. Patriot Mutual Insurance Co.</u>, 942 A.2d 663, 666 (Me. 2007).

In this case it is clear that no disagreement as to any material facts remains between the parties. Indeed, since an insurer's duty to defend is determined by comparing

its insurance policy with the underlying complaint, the only material facts about which the parties could even possibly disagree relate to whether and when Acadia provided an insurance policy to T. Buck.  Here, both parties agree that T. Buck maintained a series of consecutive liability policies with Acadia from April 1, 1999 through April 1, 2002.  (Paper 21-9 ¶ 1; Paper 23 ¶ 1).  Thus, the remaining dispute is a purely legal one.

The Acadia insurance policies at issue rely on standard language developed by an association of domestic property and casualty insurers, the Insurance Services Office, for commercial general liability ("CGL") policies. American Home Assurance Co. v. AGM Marine Contractors, Inc., 467 F.3d 810, 811 (1st Cir. 2006).  Under the coverage-granting provisions of these policies, Acadia's duty to defend is triggered if the underlying complaint alleges (1) an occurrence, (2) causing property damage that, (3) occurred within the policy period.[2]  If these three elements

---

[2] The relevant portions of T. Buck's Acadia insurance policy state:

a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply...

are satisfied then coverage is subject only to additional coverage exclusions which are attached to the policy and are, under Maine law, generally disfavored. (Paper 21-3 at 3); Hall v. Patriot Mutual Insurance Co., 942 A.2d at 666.

## I. **Acadia's Duty to Defend**

### A. Timing of the Property Damage

With regard to the coverage-granting provisions of T. Buck's Acadia policy, the only remaining issue is whether the alleged property damage "occurred" during the policy period.[3]  Of course, it is essential that the policy's temporal element be satisfied.  Acadia is not obligated to defend T. Buck if "property damage" caused by an "occurrence" occurred outside of T. Buck's policy period with Acadia.

Acadia argues that property damage occurs when it actually manifests itself, or when it is or should be

---

b.    This insurance applies to 'bodily injury' and
'property damage' only if:

(1) The 'bodily injury or 'property damage' is caused
by an 'occurrence' that takes place in the 'coverage
territory'; and

(2) The 'bodily injury' or 'property damage' occurs
during the policy period.

[3]    This is the only issue upon which Acadia based its motion
for summary judgment (Paper 20-2 at 6-9), and at a hearing held on
January 21, 2009, counsel for Acadia conceded that both the "occurrence"
and "property damage" prongs of its policies were satisfied by the
underlying complaint.

discovered. (Paper 20-2 at 6). Under this "manifestation trigger" theory, Acadia would have no obligation to defend because its policy period ended in 2002, years before the relevant damage was discoverable in 2004. See Joe Harden Builders, Inc. v. Aetna Casualty and Surety Co., 486 S.E.2d 89, 90 (S.C. 1997).

On the other hand, Travelers contends that in latent-defect or "progressive" damage cases, property damage occurs from the time there is an "injury-in-fact" continuously through the actual manifestation of damages. Travelers argues that this "injury-in-fact" and "continuous trigger" theory would give rise to a duty of defense here because the underlying complaint alleges "progressive damage" in the form of deteriorating concrete that occurred continuously during Acadia's policy period. See Id.; (Paper 21-2 at 11-15).

The Maine Supreme Court has not yet decided when property damage "occurs" within the meaning of occurrence-based CGL insurance policies.[4] In general, courts have applied a variety of standards to answer this question,

---

[4] The Court carefully considered certifying this issue to the Maine Supreme Judicial Court. See Me. R. App. P. 25(a). However, in a status conference held on February 6, 2009, both parties strongly urged the Court to decide these motions on the current record. In the interests of both parties, as well as in achieving an efficient resolution of this matter, the Court has declined the option of certification.

including the "manifestation trigger" and "injury-in-fact"
theories proposed by Acadia and Travelers respectively.[5]  Of
course, these standards only diverge when applied to factual
circumstances, such as here, in which the manifestation of
property damage occurred some time after the initial
infliction of property damage, i.e., the initial "injury-in-
fact."[6]  Recently, a number of jurisdictions dealing with
similar facts and policy language have agreed with Travelers
that progressive property damage occurs when there is an
"injury-in-fact" and continuously thereafter.  For example,
in Joe Harden Builders the South Carolina Supreme Court
considered a case in which improperly laid concrete caused
brick walls to deteriorate, unknowingly, from the time the
walls were erected until the damage was discovered some
period of time later.  Joe Harden Builders, Inc., 486 S.E.2d

---

[5]     See PHILIP L. BRUNER AND PATRICK J. O'CONNOR, JR., BRUNER AND O'CONNOR ON
CONSTRUCTION LAW § 11-73 - § 11-76 (May 2008) (providing general description
of "manifestation trigger"; "injury-in-fact trigger"; "exposure
trigger"; and "continuous injury trigger"); see also Joe Harden
Builders, 486 S.E.2d at 90-91.

[6]     In Don's Building Supply, Inc. v. OneBeacon Insurance, Co., 267
S.W.3d 20, 27 (Tex. 2008), the Texas Supreme Court explained that some
courts rely on the concept of "manifestation" only to distinguish the
time of actual property damage from the negligent act that caused it,
and not to demarcate a relevant difference between the time at which
there is property damage and the time at which it is discovered.  Acadia
overlooks this distinction in its interpretation of Kraul v. Maine
Bonding & Casualty Co., 559 A.2d 338 (Me. 1989), and conflates the time
of injury-in-fact with the time of the precipitating negligent act.
(Paper 27 at 2-3).  Contrary to Acadia's position, rejecting the latter
trigger does not also require rejecting the former.

at 89.  To resolve the timing issue, the court adopted a
theory under which liability "coverage is triggered at the
time of an injury-in-fact and continuously thereafter to
allow coverage under all policies in effect from the time of
injury-in-fact during the progressive damage."  Id. at 91.
Thus not only did the court employ a standard to find that
progressive property damage "occurred" over a period of time
prior to manifestation, it specifically contemplated that
"this theory...will allow the allocation of risk among
insurers when more than one insurance policy is in effect
during the progressive damage."  Id.

        Similarly, in Young Women's Christian Association
of National Capital Area, Inc. v. Allstate Insurance Co. of
Canada, 275 F.3d 1145 (D.C. Cir. 2002), the D.C. Circuit
applied a continuous trigger theory for coverage over pre-
cast concrete panels that progressively deteriorated before
the damage was discovered.  The court explicitly rejected a
manifestation theory and explained that "District of
Columbia law applies the continuous trigger where the damage
is of a continuous nature."  Id. at 1154; see also Don's
Building Supply, Inc. v. OneBeacon Insurance Co., 267 S.W.3d
20, 24-25 (Tex. 2008) (holding that an insurer "must defend
any claim of physical property damage that occurred during

the policy term" and that the "date the physical damage is or could have been discovered is irrelevant"); Transcontinental Insurance Co. v. W.G. Samuels Co., Inc., 370 F.3d 755, 758 (8th Cir. 2004) ("The Kansas Supreme Court has adopted an injury-in-fact rule for purposes of determining when coverage is triggered under a CGL policy. Under this rule, insurance coverage is triggered on the date when an actual injury or damage occurs, even if the injury has not yet been discovered or become manifest.") (internal citations omitted); LaFarge Corp. v. National Union Fire Insurance Co. of Pittsburgh, Pa., 935 F. Supp. 675, 682-684 (D. Md. 1996) (relying on an injury-in-fact theory in which the injury-in-fact "occurred continuously" over time to trigger coverage for defective cement railroad ties); Maryland Casualty Co. v. W.R. Grace and Co., 23 F.3d 617, 628 (2d Cir. 1993) ("If property damage is ongoing, then it is possible to trigger several successive insurance policies because the damage-in-fact occurs over a time continuum.").

In addition to this line of recent inter-jurisdiction case law, the plain language of Acadia's insurance policy itself favors an injury-in-fact and continuous trigger standard. The policy requires only that "'property damage' occur[] during the policy period," and

mentions no requirement that such damage be discovered or become manifest during the policy period. To read it otherwise would essentially transform the policy from the occurrence-based policy both parties clearly intended it to be, to a claims-based policy providing coverage based on when particular claims are made. See Hartford County v. Hartford Mutual Insurance Co., 610 A.2d 286, 294 (Md. 1992); Trizec Properties, Inc. v. Biltmore Const. Co., Inc., 767 F.2d 810, 812-813 (11th Cir. 1985); Don's Building Supply, 267 S.W.3d 20 at 29 ("Whatever practical advantages a manifestation rule would offer to the insured or the insurer, the controlling policy language does not provide that the insurer's duty is triggered only when the injury manifests itself during the policy term, or that coverage is limited to claims where the damage was discovered...during the policy period.").

Against the weight of this authority, Acadia rests its argument largely on the shoulders of one United States District Court case applying Maine law, Honeycomb Systems, Inc. v. Admiral Insurance Co., 567 F. Supp. 1400 (D. Me. 1983). Acadia argues that Honeycomb establishes a manifestation trigger under Maine law for all types of property damage. (Paper 20-2 at 6-9).

In <u>Honeycomb</u>, Honeycomb Systems designed a large dryer for Scott paper company and hired Hodge Boiler Works, Inc. to fabricate the "heads" of the dryer, which are large circular plates that hold the cylindrical portion of the dryer at each end. The various parts of the dryer were incorporated into Scott's new paper machine, and the paper machine was put into operation in May 1975. <u>Id.</u> at 1402.

In September, 1975, Scott found that most of the welds around the hub of the front dryer head had failed, and that the welds on the back head were of inadequate size and quality. The dryer had to be shut down for repair of the welds from September 6 to November 7, 1975. <u>Id.</u>

During the initial repair, Honeycomb and Scott noticed two other errors by Hodge which placed greater stress on the dryer heads. These were "boring and attachment" errors, and had nothing to do with welding. On September 3, 1977 Scott discovered a substantial crack in the hub of the back head caused by Hodge's boring and attachment errors. <u>Id.</u> Scott sued Honeycomb, and Honeycomb sought coverage from its liability insurance carrier. <u>Id.</u> at 1403.

With regard to the timing of insurance coverage, the Court explained that the "general rule is that an

occurrence happens when the injurious effects of the occurrence become apparent or manifest themselves." Id. at 1405 (internal quotation omitted). The Court then used this manifestation standard to find that one "occurrence" occurred in September 1975 when Scott discovered the front head cracking caused by welding errors, and another occurrence took place in 1977 when Scott discovered the back head cracking caused by the boring and attachment errors. Id. at 1405-1406. The Court found two separate "occurrences" because the two injuries did not share the same proximate cause. Id.

Notwithstanding its unqualified invocation of the "manifestation trigger," it is far from clear that the Maine Supreme Court would find Honeycomb controlling in this case.

First, the primary issue in Honeycomb was whether one or two occurrences took place. The court did not engage in a discussion regarding the timing of coverage triggers, and neither party appeared to dispute that coverage was triggered when Scott discovered the damage. Id. at 1405-1406.

More importantly, it is not clear from the opinion that an injury-in-fact was present prior to the manifestation of damages. Unlike the concrete panels at

issue here, which allegedly suffered injuries in the form of progressive cracking, delamination, and other deterioration, there was no cognizable damage to the dryer heads before damage was realized. During oral argument on these motions, counsel for Acadia argued that the second occurrence in Honeycomb relating to the back head cracking was particularly analogous to this case. But prior to the second occurrence Scott regularly inspected the back head of the dryer, sometimes using X-Ray technology and liquid dye penetrant to detect cracks, yet discovered no property damage until manifestation. Id. at 1402. Such close scrutiny of the Plant's roof by the City of Rutland would have surely revealed property damage prior to its actual discovery in 2004.

Thus, unlike here and the other construction defect cases discussed above, Honeycomb did not present a factual situation in which property suffered an injury that went unnoticed until the injury progressed to an advanced stage over time. Quite to the contrary, the "injury-in-fact" and the "manifestation" in Honeycomb may have been but one and the same. See Don's Building Supply, n.4, supra.

Additionally, the application of Honeycomb in this case is cast further in doubt by the Maine Superior Court's

acceptance of a continuous trigger theory in <u>Citizens Communications Co. v. American Home Assurance Co.</u>, 2004 WL 423059, *2 n.3 (Me. Super. Ct. Feb. 19, 2004) (unpublished) (recognizing that "[m]ost courts now employ the 'continuous trigger,' by triggering any policy on the risk at any time the continuing loss occurred, and requiring the insurers of those triggered policies to...defend").

Given the weight of recent and persuasive authority in analogous cases from a variety of jurisdictions, and because <u>Honeycomb</u> is distinguishable from the present case, I find that Maine would adopt an injury-in-fact and continuous trigger standard to determine when property damage occurred at the City of Rutland Water Filtration Plant. In other words, I find that, under Maine law, coverage for progressive property damage is triggered under a standard occurrence-based CGL policy when property damage occurs (without regard to when it becomes manifest), and continuously thereafter while the damage is ongoing. This conclusion is also firmly supported by the language of T. Buck's Acadia policy, which says that coverage will be provided for property damage "that occurs during the policy period," and makes no mention of predicating coverage on when such damage is or should be discovered.

In this case, the underlying complaint alleges property damage of a progressive and continuing nature that was undiscoverable until the damage reached a certain degree of severity. It is of no matter that the complaint fails to allege with specificity the actual dates on which the Plant suffered an injury-in-fact. In the duty-to-defend context, only the mere "*possibility* that the liability claim falls within the insurance coverage" must be shown. <u>Peerless</u>, 564 A.2d at 384 (emphasis added). "There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." <u>Id.</u> Ultimately, Acadia may not have to indemnify T. Buck for damage to the Plant, but a duty-to-defend is established here by the possibility that it might. <u>See</u>, <u>e.g.</u>, <u>Trizec Properties</u>, 767 F.2d at 813.

## B. <u>Policy Exclusions</u>

Having established that the underlying complaint against T. Buck sufficiently alleges property damage caused by an occurrence that occurred during the policy period, the only remaining question is whether any applicable policy exclusions nonetheless defeat coverage. Importantly, and as stated above, policy exclusions are disfavored under Maine law, and must be strictly construed in favor of the insured.

18

<u>Hall v. Patriot Mutual Insurance Co.</u>, 942 A.2d at 666.

Following oral argument on these motions, Acadia contends that only one such exclusion, the "your work" exclusion, is applicable to the underlying complaint.[7] The Acadia Policies contain the following "your work" exclusion and exception thereto:

l. Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(Paper 21-2 at 15-16). I find that, because there is a subcontractor exception to this exclusion, and because all of the relevant work in this litigation was completed on T. Buck's behalf by a subcontractor, this exclusion does not

---

[7] Acadia initially cited three exclusions as justification for denying T. Buck's claim. However, it now apparently concedes that two such exclusions, the "sistership" and "impaired property" exclusions, are inapplicable, at least at this time. (Paper 22 at 17). The "sistership exclusion" deals with withdrawing or recalling damaged property from the market, and is thus not relevant here. (Paper 21-2 at 18). Acadia's pleadings with regard to the "impaired property" exclusion fail to demonstrate why it applies (Paper 22 at 17), and at oral argument its counsel declined to offer an argument as to why it excludes coverage here. Accordingly, neither the "sistership" nor "impaired property" exclusion will preclude coverage in this case.

bar coverage here.[8]

Acadia's arguments that the subcontractor exception cannot restore coverage in this case are not persuasive. First, Acadia argues that the subcontractor exception does not apply because the underlying complaint fails to allege either "property damage" or an "occurrence." (Paper 22 at 10, 14). To begin with, this is an odd argument to make in this context, and suggests a misunderstanding about the basic structure of the insurance policy at issue. While it is true that there is no coverage if there is not both "property damage" and an "occurrence," that result is reached without ever considering the policy's exclusions or exceptions thereto. Further, Acadia made clear at oral argument that both an "occurrence" and "property damage" are sufficiently alleged.

Moreover, Acadia is wrong even if it means to argue that damage to the subcontractor's work itself does not constitute "property damage" (even if damage to other elements of T. Buck's work does), and therefore the exception for subcontractor work cannot apply. Even

---

[8] I reach this conclusion completely setting aside the question of whether this exclusion would even apply in the first place. Regardless, whatever coverage it may exclude is restored by the subcontractor exception.

assuming the validity of its premise, this argument fails because the exception applies if the "work out of which damage arises" was performed by a subcontractor. There is no question here that, even assuming *arguendo* that the only alleged property damage was suffered by T. Buck's own work (such as the Plant's water filters), any damage arose out of work performed by its subcontractor.

Second, Acadia offers a more abstract argument, suggesting that application of the subcontractor exception in this case would offend the basic principles of the "business risk doctrine." (Paper 22 at 11-14). The business risk doctrine holds that liability insurance is generally intended to provide coverage for bodily injury or property damage suffered by third parties, or "occurrence of harm risks," and *not* to provide a warranty for the replacement or repair of the insured's own defective work. See Weedo v. Stone-E-Brick, Inc., 405 A.2d 788, 790 (N.J. 1979). According to Acadia, applying the subcontractor exception here would unfairly place the burden of T. Buck's "business risks," that is, the risk that its work will be defective, on its liability insurer. Such risks, the doctrine states, are fairly placed on the insured, and should be passed on in the price of goods and services, not

spread via the payment of insurance premiums.

In support of its position Acadia cites a number
of cases, including one from Maine, that rely on the
business risk doctrine to interpret CGL insurance policies.
See, e.g., Weedo, 405 A.2d at 790; Peerless Ins. Co. v.
Brennon, 564 A.2d 383, 386 (Me. 1989) ("The distinction
between [business risks and occurrence of harm risks] is
critical to understanding a CGL policy.  A policy covers an
occurrence of harm risk but specifically excludes a business
risk.").  Acadia also relies extensively on an unpublished
order from the United States District Court in
Massachusetts, and argues that its facts are closely
analogous to those present here.  See Essex Insurance Co. v.
Bloomsouth Flooring Corp., CV-03-10275 (D. Mass. Aug. 16,
2006)(Filed in Record as Paper 22-2).

Bracketing the issue of whether the underlying
complaint alleges mere "business risks," the fatal flaw in
Acadia's position is that the business risk doctrine is
derived from specific policy exclusions which do not include
a subcontractor exception, and which are obviously not
present here.  In Essex, as well as in Weedo and the Maine
cases citing the business risk doctrine, the courts relied
on a policy exclusion that denies coverage for "property

damage to work performed by or *on behalf* of the named insured," <u>see</u>, <u>e.g.</u>, <u>Peerless</u>, 564 A.2d at 385, whereas Acadia's policy provides a specific exception that restores coverage for work done on behalf of the insured by a subcontractor. (Emphasis added).[9] Moreover, these courts also explained the centrality of policy language to their analysis. <u>Essex</u>, at 8 ("but for the exclusions raised by [the insurer], the damages alleged would be covered."); <u>Weedo</u>, 405 A.2d at 792 ("The language of the exclusion is broad, unambiguous and all-inclusive. It clearly provides that the insurance does not apply to property damage to work performed by or on behalf of appellee arising out of either the work or any portion thereof"); <u>Peerless</u>, 564 A.2d at 386 (finding that the insurance policy's "exclusion provisions preclude coverage for" business risks).

In sum, Acadia is effectively asking the Court to ignore the actual terms of the contract to which both parties agreed, in favor of a court created doctrine that is itself derived from specific terms in insurance policy

---

[9]     Acadia also relies heavily on a more recent case involving updated CGL policy language, <u>Westfield Insurance Co. v. Sheehan Construction Co., Inc.</u>, 580 F. Supp. 2d 701 (S.D. Ind. 2008), but fails to mention that the insured in <u>Westfield</u> "agreed to the endorsement that explicitly removed the...subcontractor exception" from the "your work" exclusion. <u>Id.</u> at 715. T. Buck agreed to no such endorsement here.

language. The Court declines this invitation to usurp the ability of both parties to contract freely. "The distinction between occurrence of harm risks and business risks is not a broad philosophical distinction in construing liability insurance coverage; it relates to the meaning of certain standard business risk exclusions that are not at issue in this case." <u>Massachusetts Bay Insurance Co. v. Ferraiolo Construction Co.</u>, 584 A.2d 608, 610 (Me. 1990).

Accordingly, I find that the subcontractor exception negates whatever applicability the "your work" exclusion may have, and Acadia therefore has a duty to defend T. Buck in the City of Rutland action.[10]

## II. Contribution

In addition to its declaratory judgment action, Travelers also seeks equitable relief in the form of compensation under theories of equitable contribution, equitable subrogation, and unjust enrichment. (Paper 1 ¶¶ 28-40). Specifically, Travelers seeks one-third of all costs incurred defending T. Buck to date.

---

[10] <u>See</u> <u>also</u>, <u>O'Shaughnessy v. Smuckler Corp.</u>, 543 N.W. 2d 99, 104-105 (Minn. App. 1996), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Gordon v. Microsoft Corp.</u>, 645 N.W.2d 393 (Minn. 2002) ("The exception to the exclusion, which addresses 'property damage' to 'your work,' must therefore apply to damages to the insured's own work that arise out of the work of a subcontractor. Thus, we conclude that the exception at issue was intended to narrow the Business Rick Doctrine.").

The doctrine of equitable contribution requires that when parties assume a common obligation, those parties must share equally that obligation and burden. See generally Jefferson Insurance Co. v. Travelers Insurance Co., 614 A.2d 385 (Vt. 1992); Daigle Commercial Group, Inc. v. St. Laurent, 734 A.2d 667, 675-676 (Me. 1999); LEE R. RUSS AND THOMAS F. SEGALLA, COUCH ON INSURANCE § 217:4 (3d ed. 2008). This doctrine has been applied in the insurance context and, in particular, in cases where an insurer has sought contribution for the costs of defending a mutual insured. See, e.g., Northern Insurance Co. of New York v. Allied Mutual Insurance Co., 955 F.2d 1353 (9th Cir. 1992).

I find that, having established Acadia's duty to defend, contribution is entirely appropriate here. Travelers and Acadia share a common obligation to defend T. Buck in the underlying action, and thus far only Travelers (in addition to Zurich) has assumed the burden of that obligation. Accordingly, Travelers is entitled to contribution from Acadia for one-third of all defense costs incurred to date.

Acadia objects to the equitable remedy of contribution because the issue of cost allocation is not ripe for decision. (Paper 22 at 18). But Acadia provides

no authority—and, indeed, no reason—to explain why this so. Acadia has not moved to dismiss Travelers' claims for further equitable relief, and to deny summary judgment on these claims presumes they would be deferred until trial where disputed material facts as to their merit would be resolved. However, Acadia admitted to Travelers' estimated defense fees and costs, and there are thus no such disputed facts here. (Paper 23 ¶ 9).[11]

Therefore, I recommend that Travelers' motion for summary judgment on its claim for contribution be granted.[12]

However, the Court does recognize one practical problem in fully resolving this issue here. Presumably the uncontradicted affidavit submitted by Travelers on October 3, 2008 (Paper 21-10) no longer contains an accurate estimate of defense costs paid to date. Accordingly, in the event the District Court adopts this Report and Recommendation, I recommend that the Court direct that Travelers submit an updated affidavit which accurately

---

[11]    Acadia did qualify its admission, but only to the extent that the amount of defense costs heretofore incurred is not a "material fact with regard to this declaratory judgment action." (Paper 23 ¶ 9). But a mere announcement from Acadia that contribution is not at issue here does not make it so.

[12]    As noted above, Travelers also seeks this very same remedy under theories of equitable subrogation and unjust enrichment. Since the Court recommends summary judgment for Travelers on its claim for contribution, these further claims are moot.

states the fees and costs paid to defend T. Buck until the date of the Court's Order. Alternatively (and preferably), the parties may submit a joint stipulation as to how defense costs will be allocated now that Acadia must participate in T. Buck's defense.[13]

## Conclusion

For all of the foregoing reasons I recommend that Acadia's motion for summary judgment (Paper 20) be DENIED; and Travelers' motion for summary judgment (Paper 21) be GRANTED. In accordance with these findings, I recommend that Acadia be ordered to participate fully in the defense of T. Buck in the City of Rutland action from the date of the District Court's Order, and also to provide contribution to Travelers in the amount of one-third of all defense costs paid by Travelers prior to that date.

Dated at Burlington, in the District of Vermont, this 13th day of February, 2009.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

---

[13] The Court is mindful that a mediation in the City of Rutland Action is scheduled for March 25 and 26, 2009, and understands that the parties may be better positioned to submit a joint cost allocation proposal following those negotiations.

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  Failure to file objections within the specified time waives the right to appeal the District Court's order. <u>See</u> Local Rule 72.1, 72.3 & 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).